In re The JULIEN COMPANY, Debtor.

**PLAINS COTTON COOPERATIVE ASSOCIATION OF LUBBOCK, TEXAS, d/b/a Rolling Plains Cooperative Compress of Sweetwater, Texas, Oklahoma Cotton Cooperative Association of Altus, Oklahoma and Telmark, Inc., Plaintiffs,**

v.

**The JULIEN COMPANY, Debtor, Jack F. Marlow, Trustee, Bankers Trust Company, Bank One Texas, N.A., Amsterdam–Rotterdam N.V., Bank Mees & Hope N.V., Federal Asset Management Company, French American Banking Corporation and Bayerische Vereinsbank AG, Defendants.**

**Bankruptcy No. 90–20283–B (mjn).**
**Adv. No. 90–0137.**

United States Bankruptcy Court,
W.D. Tennessee, W.D.

March 23, 1992.

William J. Landers, Memphis, Tenn., for Bankers Trust Co.

John L. Ryder, Apperson, Crump, Duzane & Maxwell, Memphis, Tenn., for Amsterdam–Rotterdam Bank, N.V.

Jack F. Marlow, Memphis, Tenn., Chapter 11 Trustee.

J. David Blaylock, Memphis, Tenn., for trustee.

Julie C. Chinn, Memphis, Tenn., Asst. U.S. Trustee.

James F. Gleason, Jr., Hertzog, Calamari & Gleason, New York City, for Bayerische Vereinsbank A.G.

Barry Radick, Risa M. Rosenberg, Milbank, Tweed, Eadley & McCloy, New York City, for Bank Mees & Hope, N.V.

William J. Lowy, Mudge, Rose, Guthrie, Alexander & Ferdon, New York City, for French American Banking Corp.

C. Wade Cooper, Jackson & Walker, Dallas, Tex., for Bank One Tex., N.A.

Jack P. Driskill, McWhorter, Cobb & Johnson, Lubbock, Tex., for Plains Cotton Co-op. Ass'n.

MEMORANDUM OPINION AND ORDER ON CROSS MOTIONS FOR PARTIAL SUMMARY JUDGMENT

WILLIAM H. BROWN, Bankruptcy Judge.

This core proceeding [1] is before the Court on cross motions for summary judgment filed by the above named parties to these adversary proceedings. Essentially at issue is whether the plaintiff, Plains Cotton Cooperative Association ("PCCA"), holds a general lien on the proceeds of cotton that was in its possession at the time The Julien Company's ("debtor") bankruptcy petition was filed and whether PCCA additionally holds liens on deferred sales options ("DSO") and warehouse receipts also in its possession on the petition date. The following constitutes findings of fact and conclusions of law pursuant to F.R.B.P. 7052 and 7056.

## SUMMARY OF FACTS

The record reflects that the debtor's bankruptcy case was commenced with the filing of an involuntary Chapter 7 petition on January 10, 1990. The case was converted to one under Chapter 11 on January 11, 1990, and Jack F. Marlow was subsequently named trustee of the Chapter 11 estate.

Prior to commencement of the bankruptcy case, the debtor was in the business of buying and selling cotton. According to PCCA, it is primarily a cotton merchandising company organized to sell cotton for its member producers. It also stores its members' cotton until such time as the cotton is sold and shipped to the ultimate purchaser. In this capacity it sold cotton to the prepetition debtor. It subsequently stored the cotton and retained the warehouse receipts until it received shipping orders from the debtor. Further, according to PCCA, in March of 1989, PCCA and the debtor entered into an oral Cotton Merchandising Agreement ("service contract"). Pursuant to this service contract, PCCA provided the debtor with a computerized inventory management system and shipment preparation services for which it charged the debtor $.50 per bale. In addition to bales of cotton covered by warehouse receipts, options to redeem bales of cotton subject to government loans (DSO's) owned by the debtor were included in the inventory

management system. The debtor was charged $.50 per bale for services related to this cotton as well. PCCA retained both the warehouse receipts and the DSO cards ("cotton documents"). (Affidavit of David Stanford, Ex. D).

Pursuant to the alleged service contract, PCCA also leased computer printers to the debtor from which the debtor could obtain inventory reports. These printers were maintained at the debtor's offices. (*Id.*) Based upon the above described arrangement with the debtor, PCCA asserts the following claims:

(1) $86,076.48 in storage charges for cotton shipped from PCCA's warehouses prior to the bankruptcy;

(2) $63,294.50 in service charges for cotton subject to warehouse receipts and DSO's which was included in the Cotton Merchandising Agreement;

(3) $233.00 in interest on the unpaid service charges;

(4) $3,547.50 in lease payments for 3 computer terminals leased to the debtor.

At commencement of the debtor's bankruptcy case, PCCA was in possession of 55,527 bales of cotton, as well as 12,945 negotiable warehouse receipts and 113,334 DSO's subject to the service contract. The debtor's business was largely financed by the institutional lenders named as defendants in these adversary proceedings. These lenders assert security interests in virtually all the debtor's assets existing at the case's inception, including the assets possessed by PCCA. PCCA asserts a lien on this same cotton, or its proceeds, for charges arising out of the storage and handling of all of the debtor's cotton. In addition, PCCA asserts a lien on the cotton documents for unpaid service contract charges.

Following his appointment as trustee, Mr. Marlow ("Trustee") was authorized to liquidate the debtor's inventory pursuant to the Court's "Order Authorizing The Trustee To Sell Property Of The Estate Free And Clear Of Liens" entered on February

1. *See*, 28 U.S.C. § 157(b)(2)(A), (B), and (K).

15, 1990. After liquidation of the inventory, PCCA was paid its "bale specific" charges, which are charges for services performed with regard to the specific cotton in storage at the time the bankruptcy case was commenced. PCCA was additionally paid $28,771.00 pursuant to a subsequent agreed order whereby the Trustee rejected the alleged cotton merchandising agreement and turned the leased computers over to PCCA and PCCA surrendered the cotton documents to the Trustee. The balance of the proceeds has been paid provisionally to the institutional lenders.[2]

In addition to authorizing liquidation of the debtor's cotton and rejection of the alleged service contract, the February 15, 1990, and May 1, 1990, orders reserved all rights of the parties and provided for the filing of complaints to enforce such rights. Thus, PCCA initiated the instant adversary proceeding to enforce its asserted "general liens" or liens asserted upon the cotton in storage at commencement of the case for charges for services related to cotton shipped prior to commencement of the case and to assert possessory liens and purchase money security interests in the cotton documents for service contract charges.

In response to PCCA's complaint, the institutional lenders filed a "Joint Motion for Partial Summary Judgment." According to the institutional lenders, PCCA, as a matter of law, has not properly reserved a general lien on the cotton in accordance with applicable law. PCCA responded to this motion with cross motions for partial summary judgment, asserting that it had in fact properly reserved a general lien as evidenced by the language of the warehouse receipts representing the cotton at issue. PCCA further asserts that it holds enforceable possessory liens and/or purchase money security interests in the cotton and cotton documents. In the alternative, PCCA contends that it is entitled to legal or equitable setoff of the amounts due, is entitled to a general lien under an equitable "color of lien" theory, or is entitled to recoupment as a matter of law. The defendant, Bankers Trust Company ("BTCo") responded to PCCA's asserted purchase money and possessory liens on the cotton and cotton documents with a cross motion for summary judgment, contending that PCCA does not hold such liens but that if the Court finds otherwise, BTCo holds superior liens. BTCo and the remaining institutional lenders dispute the alternative grounds for relief asserted by PCCA, contending each is meritless.

Therefore, with respect to the cotton, the Court is asked to determine whether the following issue may be resolved as a matter of law:

(1) Whether PCCA's warehouse receipts reflect properly reserved general liens in accordance with applicable law.

With respect to the cotton and the cotton documents, the Court is asked to determine whether the following issues may be resolved as a matter of law:

(1) Whether PCCA holds a purchase money security interest ("PMSI") in the cotton and cotton documents and, if so, whether it has priority over BTCo's claim;

(2) Whether PCCA holds a seller's security interest in the cotton and cotton documents and, if so, whether it has priority over BTCo's claim;

(3) Whether PCCA holds a possessory lien on the cotton and cotton documents for unpaid service charges and, if so, whether it has priority over BTCo's claim;

(4) Whether PCCA is entitled to legal or equitable setoff of the amounts due for unpaid storage and service charges;

(5) Whether PCCA is entitled to recoupment of the amounts due; and

(6) Whether PCCA is entitled to recover under a "color of lien" theory.[3]

---

**2.** It should be noted here that subsequent to the filing of these motions for summary judgment, Bankers Trust Company (BTCo) was substituted in the place and stead of all the institutional

lender defendants except Bank One Texas per this Court's order entered March 4, 1992.

**3.** It should be noted that PCCA has adopted the defenses and positions asserted by the plaintiffs

The parties have filed affidavits, exhibits, and extensive memoranda in support of their respective positions. Except for the existence of the cotton merchandising agreement and the amount of PCCA's claim, which are vehemently disputed by BTCo, the institutional lenders assume the facts alleged by PCCA to be true only for purposes of resolution of the issues raised by these motions and cross motions. Based on the fact that only the issues enumerated above are to be resolved with this memorandum, the Trustee adopts the positions and reasoning therefore asserted by the institutional lenders.

Examination of the pleadings, memoranda, affidavits and exhibits submitted in this proceeding has led the Court to conclude that the issues of whether the warehouse receipts' language properly reserves a general lien, whether PCCA holds possessory or purchase money security interests, and whether PCCA is entitled to setoff are governed by statutes. The remaining issues are governed by applicable case law.

## SUMMARY JUDGMENT

The general standard for summary judgment in the bankruptcy context is found at F.R.B.P. 7056(c):

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

This standard does not allow the "mere existence of some alleged factual dispute between the parties [to] defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (emphasis in original). The substantive law governing the case

in Adversary Proceedings 90–0051, 90–0065, 90–0066, 90–0138, 90–0135, 90–0139, 90–0140, 90–0141, 90–0142, 90–0144, 90–0145, and 90–0250. These defenses shall be discussed with respect to PCCA's claim only in this memorandum.

will determine what issues of fact are material and the proper inquiry is the same as that used on federal directed verdict motions, "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one sided that one party must prevail as a matter of law." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir.1989).

Given these mandates, it is the Court's task to determine whether the evidence presented in these proceedings is "so one sided that one party must prevail as a matter of law." *Id.*

## STATUTORY CONSTRUCTION

As mentioned above, the Court has determined that the general lien reservation, possessory lien, purchase money security interest and setoff issues are governed by statutes. Therefore, consideration of the rules governing statutory construction is appropriate at this juncture.

■ A review of recent case law emanating from the Supreme Court and Court of Appeals for the Sixth Circuit[4] reveals an emphasis on application of the "plain meaning rule" to statutes which appear unambiguous. *See, e.g., U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); *In re C.L. Cartage Co., Inc.*, 899 F.2d 1490 (6th Cir. 1990). Strictly stated, the "plain meaning rule" stands for the proposition "that, if a literal construction of an unambiguous statute does not produce an absurd or futile result, then it is inappropriate for a court to examine extra statutory materials in an effort to determine the 'legislative intent' of the statute." *In re Idalski*, 123 B.R. 222, 225 (Bankr.E.D.Mich.1991); *U.S. v. Ron Pair Enterprises, Inc.*, 109 S.Ct. at 1030–31.

However, at the same time that it endorses the "plain meaning rule," the Supreme Court has apparently not ruled out

4. Under the doctrine of *stare decisis*, this Court is obligated to follow the precedent set by these Courts.

review of, for example, the legislative history of a statute whose meaning is "plain" to determine whether "literal application of a statute will produce a result demonstrably at odds with the intention of its drafters." *U.S. v. Ron Pair Enterprises, Inc.*, 109 S.Ct. at 1031 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)). Neither has the Court excluded consideration of legislative history or extra statutory materials when such would aid construction of the words used in the statute "however clear the words may appear on 'superficial examination.'" *In re Sinclair*, 870 F.2d 1340, 1342 (7th Cir.1989), (quoting *United States v. American Trucking Associations, Inc.*, 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1940)); (citing *Train v. Colorado Public Interest Research Group, Inc.*, 426 U.S. 1, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976); *California Federal Savings & Loan Assoc. v. Guerra*, 479 U.S. 272, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987)).

■ From these directives, it appears that although unambiguous statutes must be applied according to their terms, the Court need not refuse to consider extra statutory evidence to aid in construction of those terms or to prevent a result at odds with the intention of their drafters. The Court makes this observation as a prelude to its analysis of PCCA's arguments advanced in support of the contention that their warehouse receipts adequately reflect general liens. As will be shown, the authority referred to above allows the Court to consider all of PCCA's arguments in conducting its analysis.

### COTTON:

### WAREHOUSE RECEIPTS

PCCA and Rolling Plains Cooperative Compress of Lubbock · and Sweetwater, Texas and Oklahoma Cotton Cooperative of Altus, Oklahoma are licensed by the respective states in which they are located. As such, state law is dispositive of whether the warehouse receipts reflect properly reserved general liens. Each state involved in these proceedings has enacted Article 7 of the Uniform Commercial Code ("UCC"). Therefore, the Court's task with respect to this issue is one of construction of the specific relevant UCC statutes and application of such to the language of the warehouse receipts.

■ As argued by PCCA, Article 7 of the UCC authorizes warehousemen to assert and claim a general lien. This authorization is found at UCC § 7–209,[5] as enacted in Texas and Oklahoma, as follows:

(1) A warehouseman has a lien against the bailor on the goods covered by a warehouse receipt or on the proceeds thereof in his possession for charges for storage or transportation (including demurrage and terminal charges), insurance, labor, or charges present or future in relation to the goods, and for expenses necessary for preservation of the goods or reasonably incurred in their sale pursuant to law. *If the person on whose account the goods are held is liable for like charges or expenses in relation to other goods whenever deposited and it is stated in the receipt that a lien is claimed for charges and expenses in relation to other goods, the warehouseman also has a lien against him for such charges and expenses whether or not the other goods have been delivered by the warehouseman.* But against a person to whom a negotiable warehouse receipt is duly negotiated a warehouseman's lien is limited to charges in an amount or at a rate specified on the receipt or if no charges are so specified then to a reasonable charge for storage of the goods covered by the receipt subsequent to the date of the receipt.

(emphasis added).

■ This Court has previously found the language of this statute to be "clear and unambiguous." *See, Western Cotton Services Corp. v. Jack F. Marlow, Trustee, et al., (In re The Julien Company)*, 136 B.R. 743, 752 (Bankr.W.D.Tenn.1991). As such,

---

**5.** It should be noted that the Texas Business and Commerce Code designates the first sentence of this subsection as (a)(1) and the second and third sentence as (a)(2).

reference to extra statutory materials for its meaning is unnecessary unless such materials would aid in construction of the statute's terms or prevent results at odds with the drafters' intentions. *See, e.g., U.S. v. Ron Pair Enterprises, Inc.,* 109 S.Ct. at 1031.

Clearly, the terms of UCC § 7–209(1), when ascribed their ordinary natural meanings, dictate that warehousemen may in fact assert a lien on goods in their possession for like charges or expenses in relation to other goods received from the same depositor if a warehouse receipt was issued [6] and "if ... it is stated in the receipt that a lien is claimed for charges and expenses in relation to other goods" whether or not the other goods have been delivered elsewhere. UCC § 7–209(1). Thus, the issue becomes whether the receipt in the instant proceeding comply with that statutory mandate.[7]

■ Copies of representative warehouse receipts have been submitted as exhibits in this proceeding. They contain the following pertinent language:

... ONE BALE OF COTTON described herein to be delivered to bearer upon return of this receipt and the payment as proceeds of the original depositor's sale of the amount of all advances, charges and liabilities incurred which are due the undersigned Association as warehouseman ... The Association on behalf of its producer-patrons who delivered cotton to the warehouse claims a lien on the cotton represented hereby against the holders of this receipt for sales proceeds in the amount of all advances made and liabilities incurred and all lawful charges for storage, compression, transportation, insurance, labor or other charges, present or future, in relation to the cotton at the rate of the Association's tariff and for expenses necessary for its preservation or reasonably incurred in its sale pursuant to law. On cotton pledged to Commodity Credit Corporation and not re-

deemed prior to acquisition by Commodity Credit Corporation, the foregoing lien is limited to those charges which are authorized in the Warehouseman's Storage Agreement with CCC. By negotiation or transfer of the receipt the parties agree that the amount of all advances, charges and liabilities incurred which are due or become due to the Association are payable to it as sales proceeds collected on behalf of its producer-patrons to be distributed to them after the deduction of marketing expenses under the terms and conditions of their marketing agreement and the by-laws of the Association.

(Affidavit of David Stanford, Ex. A, Rolling Plains and Oklahoma Cotton Coop.)

It is clear that the receipts state that a lien is claimed for "all charges." In addition, they declare that upon payment of all advances, charges, and liabilities due the Association, the cotton represented by the receipts will be delivered to bearer. However, at no place in the receipts is reference made to charges "in relation to other goods." Rather, they state that a lien is claimed on the cotton represented by the receipts for all advances, liabilities and charges "in relation to the cotton." Consequently, the receipts do not comply with the plain language of UCC § 7–209 necessary for assertion of a general lien. Obviously, it would have been simple for the warehousemen to track the statutory language, thereby precluding this type of litigation. *See, e.g., Western Cotton Services Corp. v. Jack F. Marlow, Trustee, et al (In re The Julien Company),* supra.

Although the receipts do not echo the exact language of § 7–209, PCCA contends that their inclusion of the word "all" to describe the charges for which liens are claimed is sufficient to establish general liens if § 7–209 is construed and applied in conjunction with UCC §§ 1–102, 7–103 and the Official Comment to § 7–209. At a minimum, according to PCCA, considera-

---

6. *See, e.g., In re Knoware, Inc.,* 57 B.R. 163 (Bankr.D.Mass.1986); *In re Charter Co.,* 56 B.R. 91 (Bankr.M.D.Fla.1985).

7. For purposes of application of this section in this controversy, there is apparently no dispute

over whether the cotton was "deposited" or whether the charges and expenses in relation to the previously shipped cotton are "like" the charges and expenses specified in the first sentence of UCC § 7–209.

tion of these sections, in conjunction with § 7–209, raises a question of fact as to whether "all charges" encompass charges incurred with respect to previously shipped cotton.

UCC § 1–102 recites the purposes, rules of construction, and availability of variation by agreement of the effect of the provisions of the UCC. It provides, in relevant part, as follows:

(1) [Articles 1 through 9] of [t]his Act shall be liberally construed and applied to promote its underlying purposes and policies.

(2) Underlying purposes and policies of [articles 1 through 9] are:

(a) to simplify, clarify and modernize the law governing commercial transactions;

(b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties;

(c) to make uniform the law among the various jurisdictions.

(3) The effect of provisions of [articles 1 through 9] may be varied by agreement, except as otherwise provided in [articles 1 through 9] and except that the obligations of good faith, diligence, reasonableness and care prescribed by [articles 1 through 9] may not be disclaimed by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable.

(4) The presence in certain provisions of [articles 1 through 9] of the words "unless otherwise agreed" or words of similar import does not imply that the effect of other provisions may not be varied by agreement under subsection (3) ...

Section 7–103 provides that: "[t]o the extent that any treaty or statute of the United States, regulatory statute of this state or tariff, classification or regulation filed or issued pursuant thereto is applicable, the provisions of [Article 7 of the UCC] are subject thereto."

As will be discussed below, the Official Comment to § 7–209 describes the effect of the language of that section.

According to PCCA, consideration of these other sections is necessary for an appropriate construction of § 7–209 because they reflect the drafters' intention that § 7–209 is to be construed liberally, that it may be subject to variation by agreement, and that it is "subject to" the tariffs issued by the warehouse. Thus, it is PCCA's contention that in light of § 1–102, the plain language of § 7–209 may be construed liberally and the warehouse receipts' reference to "all charges" is sufficient, given a liberal interpretation, for preservation of a general lien. Further, PCCA contends that by agreement with the debtor, the parties varied the strict requirements of § 7–209 in that the parties intended the claim of liens for "all charges" to establish general liens. This intention is further reflected, according to PCCA, by the reference to and language of the tariffs, which assert liens. (See Affidavit of David Stanford, Ex. C.) Moreover, pursuant to § 7–103, PCCA argues that § 7–209 is "subject to" the language of the tariffs. Finally, PCCA contends that notwithstanding the absence of any reference to charges incurred in "relation to other goods," under the first sentence of UCC § 7–209, a specific lien arises without notation on the receipt. Thus, PCCA argues that *any* reference to a lien on the receipt is sufficient to establish a general lien. PCCA relies on the language of § 7–209 and the Official Comment thereto as support for this contention.

■ It is well settled that in effecting statutory construction and application, the specific takes precedent over the general. *In re Idalski*, 123 B.R. at 224, citing *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). The language of § 7–209 is clearly more specific than that of § 1–102. Moreover, § 7–209 provides for the creation of a statutory general lien, a legal creation in derogation of common law which, consequently, requires strict compliance with the elements necessary for its creation. *Hebert Abstract Co., Inc. v.*

*Touchstone Properties, Ltd.,* 914 F.2d 74 (5th Cir.1990); *In re Claussen,* 118 B.R. 1009 (Bankr.D.S.D.1990); *In re Bunker Exploration Co.,* 48 B.R. 708 (Bankr. W.D.Okla.1985). Therefore, notwithstanding the more general liberal construction direction of § 1–102 and its allowance for variation by agreement, the Court is not persuaded that § 7–209 may be construed other than in strict accordance with its terms with respect to the reservation of a general lien which is enforceable against third parties such as the lenders and the Trustee.

■ Neither is the Court persuaded that § 7–103 provides for the allowance of a general lien by references to tariffs on the face of the warehouse receipts. In the first place, the reference to the tariffs on these receipts, quoted above, merely refers to the fact that the charges are to accrue at the "rate of the Association's tariff." (Affidavit of David Stanford, Ex. A.) Secondly, § 7–209 unequivocally requires that charges for services "in relation to other goods" must be noted on the face of the receipt itself, while § 7–103 provides that to the extent any tariff is applicable the provisions of Article 7 are subject thereto. The Court has not been given nor found any authority which supports the conclusion that the elements necessary for creation of a general lien are governed by tariffs. Rather, those elements are spelled out in § 7–209. Thus, the Court can only conclude that the tariffs issued by PCCA are not applicable to this particular provision of Article 7. Accordingly, insofar as § 7–209 establishes general lien reservation requirements, it is not controlled by the tariffs.

This of course raises the issue of whether any reference to a lien on the receipt is sufficient to establish a general lien. Examination of the statutory language reveals that indeed no particular notation for the assertion of a specific lien is required, i.e., "a warehouseman has a lien against the bailor on the goods covered by a warehouse receipt." UCC § 7–209. However, as discussed above, with respect to a general lien, the statute declares:

> If ... it is stated in the receipt that a lien is claimed for charges and expenses in relation to other goods, the warehouseman also has a lien against [the depositor] for such charges and expenses whether or not the goods have been delivered ...

UCC § 7–209 (emphasis added).

■ As also discussed above, given the clear and unambiguous language of the statute, reference to the Official Comment or any legislative history would not ordinarily be necessary for construction of the statute. Assuming, as PCCA argues,[8] however, that the Official Comment may aid in the construction of the statute's terms, it bears consideration. The Comment provides the following:

> (1) Subsection (1) defines the warehouseman's statutory lien. A specific lien attaches automatically, without express notation on the receipt, to goods stored under a nonnegotiable receipt. *That lien is limited to the usual charges arising out of a storage transaction; by notation on the receipt it can be made a general lien extending to like charges in relation to other goods.* The same rules apply where the receipt is negotiable, ...

This language supports the validity of a warehouseman's lien and describes its effect. However, it does not, as does the statute, describe the particulars necessary for the establishment of an enforceable, general lien. The Court interprets the Comment's "by notation" instruction to refer to a notation which complies with the particulars of the statute. The statute, not the Comment, is the law enacted by the legislature. Thus, while the Comment may be helpful in determining the meaning and effect of the statute, it does not change the

8. PCCA charges that the institutional lenders "err by suggesting that the 'general lien' is one of statute." (See, PCCA's Memorandum of Points and Authorities, p. 6, n. 2) PCCA relies upon the "second numbered paragraph of the comments to § 7–209" as support for this charge. However, that comment concerns UCC § 7–209(2) and T.B. & C.C. § 7–209(b), which provides for a consensual security interest that indeed is not a statutory lien.

statute's text which must be enforced as plainly written. *See, In re Sinclair*, 870 F.2d 1340 (7th Cir.1989).

From these findings and conclusions, the Court concludes that there are no genuine issues of material fact that the elements necessary for a general lien, pursuant to UCC § 7–209, and enforceable against third parties, are lacking here. Thus, the institutional lenders and Trustee are entitled to summary judgment on this issue of whether the language on the receipts adequately reserves a general lien in accordance with UCC § 7–209.

### COTTON:

### SETOFF

■ As noted above, setoff in the bankruptcy context is governed by statute. In pertinent part, that statute provides:

(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, [Title 11 of the United States Code], this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, ...

11 U.S.C. § 553(a).

From this language, it is clear that setoff by a creditor requires the existence of mutual prepetition debts between the debtor and the creditor exercising setoff. It is further clear that, under such circumstances, with exceptions not applicable here, the right to setoff is preserved. In effect, where there are mutual prepetition debts, the creditor is entitled to retain any amounts the creditor may owe the debtor to the extent of the debtor's obligation to that creditor.

■ If the debts are mutual for purposes of setoff, "they must subsist or be owing between the same parties, in the same right or capacity, and must be of the same kind or quality." *In re Braniff Air-*

*ways, Inc.*, 42 B.R. 443, 449 (Bankr. N.D.Tex.1984). Consequently,

... as a general rule, neither a creditor nor a debtor may offset prepetition debts and claims against postpetition debts and claims because of the absence of mutuality of the parties. A *debtor's* prepetition claim against a creditor does not involve the same parties as the *debtor-in-possession's* [or trustee's] claim against the same creditor.

*Id.* (emphasis in original).

It is uncontroverted, for purposes of these summary judgment motions, that the debtor was indebted prepetition to PCCA. It is equally uncontroverted, for purposes of these motions, that the value of the proceeds remaining from the sale of the debtor's cotton exceeds the amount of PCCA's claims. The issue is whether PCCA was indebted to the debtor prepetition and, if not, whether the Court may allow setoff as a matter of equity to prevent irremedial injustice to PCCA.

With respect to the cotton stored by PCCA, PCCA contends that by virtue of its storage of the debtor's cotton which was, under state law, subject to sale for satisfaction of its storage and handling charges after which PCCA would have been obligated to remit any excess proceeds to the debtor, it was indebted to the debtor. *See* U.C.C. § 7–210. In addition, PCCA asserts that but for the February 15, 1990, order allowing the Trustee to liquidate the cotton, it would have filed a motion to lift the stay in order to liquidate the cotton. PCCA would have then been obligated to remit the proceeds to the estate, i.e., PCCA would have been indebted to the post-bankruptcy debtor, and entitled to offset its claims. PCCA further asserts that the cotton at issue here was deposited prepetition under such circumstances that the deposit would result in a debt, as if for sale or collection. PCCA primarily relies upon *Half Moon Fruit & Produce Company v. Floyd*, 60 F.2d 799 (9th Cir.1932) and *Gibson v. Central National Bank of McKinney*, 171 F.2d 398 (5th Cir.1948) in support

of its position[9].

The *Half Moon Fruit & Produce Company* case involved the bankruptcy trustee's objection to the allowance of a claim filed by Half Moon Fruit & Produce Company ("company") against the estate until the company relinquished funds it received from the sale of seventy-five cars of melons belonging to the debtor and consigned to the company for sale. The trustee alleged that the receipt of the funds by the company was a preference. Pertinent to this proceeding, that Court concluded that the company could retain the funds realized from the sale of the melons, because upon the consignment of the melons by the debtor to the company, the company "owed the [debtor] the duty of converting the melons into money for the account of the [debtor]." Thus, that obligation of the company, as consignee, was held to be a credit in the debtor's favor to be offset against the credit of the company, as consignee, for moneys previously advanced. 60 F.2d at 802.

The *Gibson v. Central National Bank of McKinney* case involved an attempt by a bankruptcy trustee to recover funds retained by the bank after it sold collateral pledged before the bankruptcy. As set forth by the Court of Appeals for the Fifth Circuit, the facts demonstrated that in December, 1944, the debtor owed the bank $10,738.26 secured by a deposit of $2,016.41 and warehouse receipts covering ten thousand bushels of corn. On December 24, 1944, the bank mistakenly honored a check drawn on the debtor's account in the amount of $1,992.63. In January of 1945, a state court appointed a receiver, who allowed the bank to sell the ten thousand bushels of corn. The net proceeds of the sale totalled $11,766.66 which, when coupled with the debtor's deposit, resulted in credits for the debtor of $13,783.07. Including the amount of the erroneously paid insufficient funds check, the debtor owed the bank $14,747.30. The trustee contended that the bank should not have been allowed to offset the amount paid on the insufficient check or the expenses of the sale. The Court found no merit in the trustee's argument that the bank's retention of these amounts constituted a preference and allowed the bank to offset the entire amount in reliance on the former Bankruptcy Act's section allowing setoffs of "mutual debts or credits." Bankruptcy Act of 1898, § 68 (11 U.S.C. § 108), reprinted in Collier on Bankruptcy, 1 Appx. 92 (15th ed.).

According to PCCA's argument in this proceeding, the *Half Moon Fruit & Produce Company* holding is significant in that the debtor's deposit of the melons resulted in a "credit in the debtor's favor" or a debt from the company to the debtor. However, the circumstances of the deposit in that case, i.e., that upon receipt of the melons, the company was obligated to convert the melons into money for the debtor's account, are distinguishable from the circumstances here. There is no evidence before this Court that PCCA owed the debtor a duty to convert the cotton into money. Rather, the evidence reflects that PCCA was to store and preserve the cotton as deposited until requested to ship it to an ultimate buyer by the debtor's representatives. Consequently, the Court concludes that the *Half Moon Fruit & Produce Company* case is not authority for resolution of the issue at bar.

With respect to the *Gibson* case, PCCA contends that it is significant in that the Bank was allowed to offset "indebtedness against the collateral *in addition* to the debt for which the collateral was pledged as security" *after* the sale of the collateral. 171 F.2d at 400 (emphasis added). Thus, the argument goes, this case supports PCCA's assertion that it is entitled to setoff, against the sales proceeds of the cotton, amounts in excess of the bale specific charges owed by the debtor.

Unfortunately, the *Gibson* opinion to which this Court is referred, located at 171 F.2d 398, offers no information concerning

9. PCCA's reliance in this regard arises from its incorporation of the arguments of similarly situated plaintiffs. *See* n. 2.

when any of the events described occurred in relation to the bankruptcy filing. No petition date is provided.[10] However, the *Gibson* Court allowed the setoff on the authority of the former Bankruptcy Act's provision allowing setoff. That section provided in pertinent part:

§ 68. *Setoffs and Counterclaims.*

a. In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be setoff against the other, and the balance only shall be allowed or paid.

b. A set-off or counterclaim shall not be allowed in favor of any debtor of the bankrupt which (1) is not provable against the estate and allowable ...; or (2) was purchased by or transferred to him after the filing of the petition or within four months before such filing, with a view to such use and with knowledge or notice that such bankrupt was insolvent or had committed an act of bankruptcy.

Bankruptcy Act of 1898, § 68 (11 U.S.C. § 108), reprinted in Collier On Bankruptcy, 1 Appx. 92 (15th ed.).

Although lacking a specified prepetition requirement as found in current 11 U.S.C. § 553, this former section did require a finding of mutuality. According to pertinent case law, this mutuality requirement included a requirement that the obligations accrue prepetition. *See, e.g., Prudential Insurance Co. of America v. Nelson,* 101 F.2d 441 (6th Cir.1939); *McDaniel National Bank v. Bridwell,* 74 F.2d 331 (8th Cir. 1934). Therefore, assuming the Court of Appeals for the Fifth Circuit adhered to this interpretation of the mutuality requirement, it may be concluded that the obligations of the parties in the *Gibson* case accrued prepetition. If not, the case is clearly not applicable here as the controlling statute in these proceedings requires mutuality of obligations *prepetition.* Either way, the case does little to bolster PCCA's argument that it is entitled to set-

off its claims against the cotton proceeds unless a prepetition indebtedness to the debtor can be shown.

Rather than a consignee as the claimant in the *Half Moon Fruit & Produce Company* case or a secured creditor as the bank in the *Gibson* case, PCCA, with respect to the cotton, acted as a warehouseman. By definition under state law, which is not preempted by any conflicting federal law, a "warehouseman is a person engaged in the business of storing goods for hire." UCC § 7–102(1)(h). Moreover, when "by a warehouse receipt, bill of lading, or other document of title" a warehouseman "acknowledges possession of goods and contracts to deliver them," that warehouseman meets the definition of a bailee. UCC § 7–102(1)(a).

It is well settled that a bailee of property is distinguishable from a debtor. The rationale is that the property, which is the subject of the bailment, is owned by the bailor. *Matter of Bevill, Bresler & Schulman Asset Mgmt.,* 896 F.2d 54, 57 (3rd Cir.1990). Thus, the elements of a bailment are described as:

... delivery of personal property by one person to another in trust for a specific purpose and acceptance of such delivery, and an express or implied contract that the trust will be carried out and *the property* returned to the bailor or dealt with as he directs.

*Braniff Airways, Inc. v. Exxon Co., U.S.A.,* 814 F.2d 1030, 1038 (5th Cir.1987) (emphasis added).

In the instant proceedings, PCCA does not dispute that it acknowledged possession of the cotton by issuance of warehouse receipts. Nor does PCCA dispute that it contracted with the debtor to ship the cotton upon request of the debtor. It may thus be concluded that, with respect to the cotton, PCCA qualifies as a prepetition bailee, rather than a debtor. Regardless of what PCCA would or could have done but for the bankruptcy petition, the fact remains that it owed no mutual prepetition

---

**10.** The institutional lenders state that they examined the appellate record in *Gibson* finding that the bank realized on its security interest

prepetition. Institutional Lenders' Joint Response ..., p. 40, n. 28 (8/19/91).

debt to the debtor. As such, it may further be concluded that PCCA is not entitled to setoff its claims for cotton charges pursuant to § 553.

■ This legal conclusion, of course, leaves the issue of whether PCCA may be allowed to setoff its claims under principles of equity. The remedy of setoff is one rooted in equity, thus, it has been held that the "allowance of setoff lies within the sound discretion of the trial court." *In re Braniff Airways, Inc.*, 42 B.R. at 448 (citations omitted). However, the court's discretion is not without limits. Generally, a court should deny setoff where the requirements of mutuality of parties and claims is missing. *Id.* A court of equity could permit setoff even though mutuality is lacking. It should decline to do so, however, "absent a showing of irremedial injustice." *Id.* This is because equity follows the law and "will not ordinarily allow a setoff of debts accruing in different rights or dissimilar capacities." *Id.* at 449.

According to PCCA, it held the cotton subject to a "color of lien." Moreover, it adopts the arguments of the similarly situated plaintiffs [11] that "irremedial injustice" would occur if it is not allowed to setoff its claims and the lenders will be unjustly enriched as a result of their own actions. Further, according to PCCA, the equities in this proceeding favor PCCA as opposed to the institutional lenders because the lenders had control and knowledge of the debtor's finances. The institutional lenders contend that to allow an equitable setoff under the circumstances here would effectively circumvent the requirements for setoff in the bankruptcy context as contained in § 553. According to the institutional lenders, PCCA's expectation of payment and subsequent nonpayment simply renders PCCA an unsecured creditor, but does not entitle it to setoff in contravention of the statute.

While there may be some merit to PCCA's argument that the equities of this case are in its favor because the lenders had knowledge of the debtor's finances, it must be remembered that the remedy of setoff in this context is statutorily defined. As discussed above, although "irremedial injustice" may allow exceptions to the statutory requirements, the Court has not found nor been provided any examples of "irremedial injustice" justifying such exceptions. To the contrary, the cases examined reflect a reluctance by the courts considering the issue to find "irremedial injustice" when the disallowance of equitable setoff results in a creditor holding an unsecured claim. *See, e.g., In re NWFX, Inc.*, 864 F.2d 593 (8th Cir.1989); *Boston & Maine Corp. v. Chicago Pacific Corp.*, 785 F.2d 562 (7th Cir.1986); *In re B & L Oil Co.*, 782 F.2d 155 (10th Cir.1986).

Moreover, the equity powers of this Court are generally limited by the parameters of the Bankruptcy Code as reflected by the Supreme Court's admonition

> that whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.

*Norwest Bank of Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 968–69, 99 L.Ed.2d 169 (1988). Given these precedents and the existence of statutorily defined parameters for exercising setoff, the Court concludes that, as a matter of law, it cannot extend those parameters to allow equitable setoff in this proceeding. Consequently, the institutional lenders and Trustee are entitled to summary judgment on the issues of whether PCCA is entitled to legal or equitable setoff of their claims for unpaid cotton storage charges on previously shipped cotton.

COTTON:

RECOUPMENT

■ In addition to setoff, PCCA urges that it is entitled to recover its charges by recoupment. Like setoff, the doctrine of recoupment is important in the bankruptcy context for, where applicable, it may be used to afford a creditor preferential treatment. *In re NWFX, Inc.*, 864 F.2d at 597.

---

**11.** *See* n. 2.

Both setoffs and recoupment are counterclaims, but they differ in that the setoff is a claim that arises out of a transaction different from the one sued on. It is asserted to diminish a plaintiff's demand. *Frederick v. U.S.*, 386 F.2d 481 (5th Cir. 1967) ... Recoupment, which is a defense as well as a counterclaim, on the other hand, is a counter demand arising from the same transaction as the plaintiff's claim. *Lee v. Schweiker*, 739 F.2d 870, 875 (3rd Cir.1984).

*In re Buttes Resources Co.*, 89 B.R. 613, 615 (S.D.Tex.1988); *see also In re Holford*, 896 F.2d 176, 178 (5th Cir.1990); *In re B & L Oil Co.*, 782 F.2d 155, 157 (10th Cir.1986). In addition, recoupment is most commonly, though not always, allowed where the parties were operating under a contract which specifically allowed recoupment. *In re NWFX, Inc.*, 864 F.2d at 597; *cf. In re Holford*, 896 F.2d 176 (5th Cir.1990).

As discussed above, the Court has found that no prepetition mutual obligations existed between PCCA and the debtor. Assuming arguendo, however, that PCCA did owe an obligation, i.e., the potential proceeds from the cotton in storage, to the debtor, there is no evidence that such an obligation would have arisen out of the same transaction as the debtor's obligation to PCCA, i.e., payment for services in connection with the previously shipped cotton. The debtor's obligation to pay for services performed with regard to previously shipped cotton would seemingly have arisen out of the transactions involving that cotton rather than out of the transactions involving the cotton in storage at commencement of the case. Having no evidence of mutual claims arising out of the same transaction, the Court concludes that PCCA's motion for summary judgment under the recoupment doctrine must be denied, and the institutional lenders and Trustee are entitled to summary judgment on this issue.

### COTTON:

### EQUITABLE COLOR OF LIEN

 Finally, PCCA contends that it is entitled to recover its charges for services performed with respect to all of the debtor's cotton from the proceeds on hand on the basis that the cotton it held at the commencement of the case was subject to an equitable color of lien. From a review of PCCA's memorandum and caselaw cited therein, it is the Court's understanding that an equitable color of lien is essentially a lien, enforceable in equity, that arises by virtue of the parties' express or implied agreement and custom and course of dealing with one another. It is a remedy imposed to avoid unjust enrichment. *See, e.g., Citizens Co-op Gin v. United States*, 427 F.2d 692 (5th Cir.1970); *In re McConnell*, 122 B.R. 41, 45 (Bankr.S.D.Tex.1989). Consistent with the Court's understanding is PCCA's argument here that it essentially had an agreement with the debtor, as illustrated by their custom and course of dealing, that PCCA would ship cotton at the direction of the debtor, submit invoices for accrued charges to the debtor and receive payment from the debtor. All parties were aware that if not paid, the warehousemen would refuse to ship further cotton. In support of this argument PCCA has submitted the affidavit of David Stanford, Sales Manager of PCCA and D.E. Orendorf, a former employee of and consultant to the debtor.

The institutional lenders have responded to these arguments and affidavits, contending that the allowance of such equitable liens would effectively annihilate the above discussed statutes and precedent applicable to these proceedings, which govern the establishment of general liens.

The Court recognizes that the arguments posed by PCCA in support of an equitable lien remedy are dangerously similar to, if not exactly like, the arguments presented in support of interpreting the warehouse receipts so as to reflect general liens and of finding an equitable right of setoff. Moreover, in contrast to the arguments and supporting evidence submitted by the similarly situated plaintiffs in their respective adversary proceedings,[12] PCCA has presented no evidence which indicates that

---

**12.** *See* n. 2.

BTCo or the other institutional lenders, via L & S Cotton Systems, Inc. or otherwise, were involved in PCCA's dealings with the prepetition debtor. In addition, although PCCA relies upon the alleged cotton merchandising agreement as the foundation of its claimed lien for unpaid storage charges, it has presented no evidence or authority which would render such an agreement superior to the requirements of UCC § 7–209 or 11 U.S.C. § 544. Accordingly, given the Court's above conclusion that the general lien requirements of UCC § 7–209 must be strictly construed, the Court concludes that although PCCA may have had an understanding with the prepetition debtor, as opposed to the Trustee or lenders, that it could recover from presently held cotton proceeds funds sufficient to pay storage charges for previously shipped cotton, such an understanding does not create a lien, equitable or otherwise, enforceable against the Trustee or institutional lenders. Nor does the assertion of such an understanding, in the face of the statutory requirements, create a genuine issue of material fact with respect to whether PCCA held the cotton in storage under an enforceable color of lien. Consequently, the institutional lenders and the Trustee are entitled to summary judgment on this issue.

## COTTON AND COTTON DOCUMENTS:

### PURCHASE MONEY SECURITY INTEREST

■ According to PCCA, it holds a purchase money security interest in the cotton and cotton documents to secure the payment of its claims for unpaid storage and service contract charges. Further, according to PCCA, this is because PCCA sold the cotton and cotton documents to the debtor but retained possession thereby securing its claim.

A purchase money security interest is defined at § 9–107 of the UCC as follows:

A security interest is a "purchase money security interest" to the extent that it is:

(a) taken or retained by the seller of the collateral to secure all or part of its price;

(b) taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral, if such value is so used; . . .

As noted above, the claims asserted here by PCCA are for unpaid storage, handling and alleged service contract charges and not for the purchase price or advances made to the debtor to enable the debtor to purchase the cotton, DSO's or warehouse receipts. Consequently, it may not be concluded that PCCA possesses a purchase money security interest within the meaning of UCC § 9–107 in the cotton and cotton documents and the Trustee and BTCo are entitled to summary judgment on this issue.

### COTTON DOCUMENTS: [13]
### SELLER'S SECURITY INTEREST AND POSSESSORY LIEN

PCCA next asserts that as the seller which retained title by virtue of its retention of the cotton and documents, it retained a security interest pursuant to UCC § 2–401(1)(a). This section provides in pertinent part:

. . . Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of the article on Secured Transactions (Article 9 . . .) title to goods passes from the Seller to the buyer in any manner . . . explicitly agreed on by the parties.

Obviously, it is uncontroverted here that PCCA maintained possession of the ware-

---

**13.** Having concluded, from the above discussion, that, absent the appropriate language on the warehouse receipts, only the bale specific storage and service charges may be recovered from the proceeds of the cotton possessed at commencement of the case, and those charges having been recovered by PCCA, the balance of this memorandum opinion is devoted to resolution of the issues raised by PCCA's claimed liens for service charges against the proceeds of the cotton documents.

house receipts and DSO's at issue. As such, it is equally obvious that none of these items was shipped or delivered to the debtor. Thus, the issue becomes whether PCCA's retention of these items create a security interest that is enforceable against the lenders and the Trustee.

BTCo argues that inasmuch as PCCA never shipped or delivered the items at issue, § 2–401 is not applicable to the situation at bar. However, § 2–401 is described as providing for a "security interest arising ... under the article on sales." UCC § 9–113, Comment 1. A "security interest" is defined at UCC § 1–201(37) as "an interest in personal property or fixtures which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (§ 2–401) is limited in effect to reservation of a security interest."

 From this language, it appears that a security interest may be created in property to ensure the payment of any obligation and that shipment or delivery of the collateral is not necessarily a prerequisite to reservation of a security interest under § 2–401 in goods sold. Indeed, § 9–113 that substantiates a security interest arising under § 2–401 provides:

A security interest arising solely under the article on sales (Article 2 ...) is subject to the provisions of this article [Article 9] except that to the extent that and so long as the debtor does not have or does not lawfully obtain possession of the goods:

(a) no security agreement is necessary to make the security interest enforceable; and

(b) no filing is required to perfect the security interest; and

(c) the rights of the secured party on default by the debtor are governed by the article on sales.

It is apparent from this section that a seller may in fact reserve a security interest in goods by retaining possession of the goods themselves or the title thereto. Further,

compliance with the security agreement and filing requirements of Article 9 [14] is not necessary to create a security interest in favor of a seller by retained possession. As discussed above, PCCA clearly retained possession of the collateral. Therefore, upon application of the requirements of § 9–113, it may be concluded that, to the extent the retained collateral is comprised of the title to goods or goods actually sold to the debtor, PCCA possesses a seller's security interest in those items. However, the scope of such a security interest is governed by § 9–113(c). Pursuant to that section, the security interest that arises under § 2–401 and that is exempt from the security agreement and filing requirements of Article 9 grants the holder thereof *only* the "rights ... governed by the article on sales" upon default by the debtor. *See, e.g.*, UCC § 9–113, Official Comment 5; *In re Ault*, 6 B.R. 58 (Bankr.E.D.Tenn.1980). The rights of a seller upon default by a debtor under the article on sales (Article 2) are essentially designed to result in the seller's recovery of the purchase price of the items and damages incidental to that recovery. This is evident from the statutorily described buyer's defaults, e.g., wrongful rejection of goods or failure to make a payment due on or before delivery of the goods, and remedies therefor, e.g., withholding delivery of the goods or resale and recovery of damages. UCC § 2–703. *See also*, UCC §§ 2–702; 2–704; 2–705; 2–706; 2–708; 2–709; 2–710.

 Accordingly, the seller's reserved security interest under UCC § 2–401 and § 9–113, absent compliance with the perfection and attachment requirements of Article 9 for possessory or non-possessory security interests, merely entitles the seller to invoke the remedies of an aggrieved seller under Article 2. *See*, UCC §§ 9–203; 9–204; 9–302; 9–304; and 9–305. This is significant for purposes of the instant proceeding because PCCA, as the purported seller's security interest holder, makes no claim for damages arising from the debtor's breach of a *sales* agreement. Rather, according to PCCA, its claims are for un-

---

**14.** *See,* UCC §§ 9–105(1)(*l*); 9–203; 9–204; 9–302; 9–304 and 9–305.

paid storage and service contract charges. Obviously then, absent compliance with the perfection requirements of Article 9, it might be concluded that § 2–401 is not applicable here.

However, PCCA asserts that it has complied with the perfection provisions of Article 9 because it retained possession of the items at issue pursuant to an agreement with the debtor as required by UCC § 9–203. Given the perfection by possession provisions of Article 9, which shall be discussed below, if, and only if, the existence and validity of such an agreement can be demonstrated, it may also be established that PCCA holds a valid security interest in the cotton documents for the charges claimed under UCC § 9–203 rather than § 2–401, regardless of their nature and of whether it actually sold those items to the debtor as required by § 2–401.

Although "perfection" of a security interest under Article 9 is said to occur when the security interest has attached and all applicable steps for perfection here have been taken, "perfection" is not defined by the UCC. UCC § 9–303(1). However, it may be equated roughly with public notice. As such, it requires compliance with applicable Article 9 notice provisions. David G. Epstein, et al., Basic Uniform Commercial Code, p. 98 (3rd Ed.1988).

With respect to possessory security interests, the secured party's possession is generally considered adequate notice of the claimed security interest. UCC § 9–302. Thus, § 9–305 provides, in pertinent part, that:

> A security interest in ... goods, instruments, ... money, negotiable documents or chattel paper may be perfected by the secured party's taking possession of the collateral ...

However, in order to attach and be enforceable against the debtor or third parties, the possessory security interest must meet the requirements of UCC § 9–203. This section essentially requires that:

> (1)(a) ... the collateral is in the possession of the secured party pursuant to an agreement, or the debtor has signed a security agreement which contains a description of the collateral and
>
> (b) the value has been given; and
>
> (c) the debtor has rights in the collateral.

"Attachment" occurs when the events just described have taken place and the "security interest becomes enforceable against the debtor with respect to the collateral." UCC § 9–203(2). Clearly, PCCA had possession of the alleged collateral and as mentioned above, it asserts that this possession was pursuant to an agreement, i.e., the Cotton Merchandising Agreement, with the debtor. BTCo vehemently disputes the existence and validity of such an agreement and contends that the DSO's at issue here do not qualify as a type of collateral in which a security interest may be perfected by possession. Further, according to BTCo, even if it may be concluded that PCCA holds a valid security interest, BTCo's security interest has priority.

Turning first to the issue of the alleged agreement, BTCo submits that in order to present evidence sufficient to refute the existence of the alleged agreement between PCCA and the debtor, it must conduct additional discovery. In light of the fact that discovery has been stayed in this proceeding pending resolution of the summary judgment motions, and as a result, BTCo has not had a fair opportunity to investigate this matter, the Court concludes that, if necessary, BTCo would be entitled to conduct additional discovery regarding this issue. Assuming, however, that the agreement is valid, and PCCA, in that respect, holds a possessory security interest, the Court must next determine whether the DSO's qualify as negotiable documents,[15] instruments or chattel paper in order to determine whether they properly may be the subject of a possessory security interest pursuant to UCC § 9–305.

According to PCCA's "Reply ... To Bankers Trust Company's Memorandum

---

**15.** Because it is uncontroverted here that the warehouse receipts at issue were issued to "Bearer," it may be concluded as a matter of law that they qualify as negotiable documents pursuant to UCC §§ 7–104 and 1–201(15).

..." at p. 3, "[a] DSO entitles the bearer to possession of a warehouse receipt and the cotton represented by the warehouse receipt." As such, according to PCCA, a DSO qualifies as a document of title which may be subject to a possessory security interest. From the examples submitted as exhibits in this proceeding, it is evident that a DSO is a writing. (Affidavit of David Stanford, Ex. B) The exhibits are entitled "Deferred Sales Option" and include blank spaces for the description of one bale of cotton. They each purport to cover one bale of cotton subject to a governmental Commodity Credit Corporation loan. They provide that upon surrender of the DSO "writing" and payment of the loan amount due by the holder of the DSO, if prior to 15 days before the loan matures, the warehouse receipt representing the cotton subject to the DSO will be delivered to the holder of the DSO.

BTCo disputes PCCA's classification of the DSO's as documents of title and asserts that they are "general intangibles" under the UCC. Therefore, according to BTCo, the only means of perfecting a security interest therein is by compliance with the filing requirements of Article 9.

A "document of title" is defined by the UCC as a:

> bill of lading, dock warrant, dock receipt, warehouse receipt, or order for the delivery of goods, and also any other document which in the regular course of business or financing is treated as adequately evidencing that the person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers. To be a document of title a document must purport to be issued by or addressed to a bailee and purport to cover goods in the bailee's possession which are either identified or are tangible portions of an identified mass;

UCC § 1–201(15).

"Chattel paper" is a writing or writings which evidence both a monetary obligation and a security interest in or lease of specific goods. UCC § 9–105(1)(b). An "instrument" is defined as a "negotiable instrument, [e.g., a check, draft, certificate of deposit, or note], a certificated security or any other writing which evidences a right to the payment of money and is not itself a security agreement or lease and is of a type which is in [the] ordinary course of business transferred by delivery with any necessary endorsement or assignment." UCC § 9–105(1)(i) and § 3–104(1).

A "general intangible" is defined as "any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments and money." UCC § 9–106.

Given that the DSO's are, by their own terms, writings which may be, in essence, exchanged for documents of title, i.e., warehouse receipts, they do not appear to qualify as documents of title under the UCC. Rather, they appear to be simple contracts. Moreover, with respect to the DSO's at issue here, it does not appear that they "purport to cover goods in the bailee's possession" as required by § 1–201(15). This is because PCCA had 55,517 bales of cotton in its possession at commencement of the case and 113,334 DSO's. Additionally, it does not appear from the pleadings that the 55,527 bales possessed by PCCA were subject to any of the 113,334 DSO's possessed by PCCA. (*See, e.g.,* Second Amended Complaint, ¶ 15) Consequently, the Court can not conclude as a matter of law that these DSO's qualify as negotiable documents. Neither can the Court conclude that these DSO's qualify as chattel paper as they do not, by their terms evidence a security interest in or lease of specific goods. Finally, it clearly may not be concluded that the DSO's qualify as instruments because, again by their terms, they do not evidence an unconditional right to the payment of money as required by UCC § 9–105(1)(i) and 3–104(1). From this discussion, it is evident that whether or not the DSO's are "general intangibles" under the UCC is of little relevance because they clearly do not qualify as proper subjects for a possessory security interest under § 9–305.

■ Having reached this conclusion, the issue becomes whether, assuming

PCCA's agreement with the debtor gives rise to a valid possessory security interest in the warehouse receipts or "documents," this security interest has priority over BTCo's asserted security interest therein.

As to this issue, BTCo contends that its asserted blanket security interest, by virtue of a security agreement with the debtor and UCC–1 filing in the debtor's assets, has priority over PCCA's possessory interest for two reasons: one, because BTCo's security interest is a purchase money security with priority pursuant to UCC § 9–107 and 9–312 and; two, because its security interest was perfected and attached before that of PCCA pursuant to UCC § 9–312. PCCA counters this contention by asserting that its security interest has priority by virtue of UCC § 9–309 and 9–310.

In pertinent part, § 9–309 provides:

Nothing in this Article [Article 9] limits the rights of a holder in due course of a negotiable instrument ... or a holder to whom a negotiable document of title has been duly negotiated ... and such holders ... take priority over an earlier security interest even though perfected. Filing under this chapter does not constitute notice of the security interest to such holders ...

Although not specified in the arguments presented by PCCA, PCCA is presumably claiming to be "a holder to whom a negotiable document of title has been duly negotiated" for purposes of its priority assertion because the alleged collateral at issue consists of warehouse receipts or "negotiable document[s] of title." [16] UCC § 9–309.

For purposes of this discussion, a "holder" is a person who is in possession of a document of title "issued or indorsed to him or to his order or to bearer or in blank." UCC § 1–201(20). Having estab-lished above that a warehouse receipt is a document of title and that the warehouse receipts possessed by PCCA were issued to "bearer," and thus negotiable documents, it may be concluded that PCCA is a "holder" within the meaning of the UCC. Thus, the question becomes whether PCCA is a holder to whom a negotiable document of title "has been duly negotiated."

"A negotiable document of title is ... negotiated by delivery alone when by its original terms it runs to bearer." UCC § 7–501(2)(a). "Delivery" is the "voluntary transfer of possession." UCC § 1–201(14). In addition, a "duly negotiated" document of title is one that is purchased [17] in good faith without notice of any defense against or claim to it on the part of any person, and for value, other than receiving the document in settlement or payment of a money obligation, in the regular course of business or finance. UCC § 7–501(4). These components of "due negotiation" are particularly significant because the holder of a duly negotiated document of title thereby acquires, *inter alia*, title to the documents and the goods. UCC § 7–502.

There has been no evidence in this proceeding that PCCA took the documents with or without notice of BTCo's claim and apparently a previously filed security agreement does not constitute notice for purposes of § 9–309. Neither has PCCA's good faith been questioned. Thus, the Court must consider whether the documents were "delivered" to PCCA and, if so, whether PCCA purchased them for value in the regular course of business or finance.

As noted above, delivery alone of a negotiable instrument issued to bearer constitutes "negotiation" of the document. "Delivery," with respect to negotiable documents, is the voluntary transfer of posses-

---

**16.** The Court takes the liberty of making this presumption because, just as DSO's are not "instruments" within the meaning of the UCC in that they do not evidence an unconditional promise to pay money, warehouse receipts do not qualify as "instruments" for the same reason. Obviously, to be a "holder in due course of a negotiable instrument" for purposes of § 9–309, one must hold an "instrument."

**17.** A "purchase" includes taking by sale, discount, negotiation, mortgage, pledge, lien, issue, or reissue or any other voluntary transaction creating an interest in property. UCC § 1–201(32). Presumably, it is PCCA's position that it "took" these receipts that it issued by consensual lien pursuant to its alleged agreement with the debtor.

sion. In the instant proceeding, given that PCCA purportedly sold the documents and the cotton represented thereby to the debtor, the evidence demonstrates that the documents were issued by PCCA to bearer and retained by PCCA. There is no evidence that possession of the documents was "voluntarily transferred" from PCCA. Consequently, there is no evidence that the documents were "delivered" and, thus, "negotiated" to PCCA for purpose of the due negotiation requirements of § 7–501.

Accordingly, further inquiry into PCCA's holder status is unnecessary and it may be concluded that PCCA does not meet the necessary requirement of a "holder to whom a negotiable document of title has been duly negotiated" for purposes of § 9–309 which grants such a holder priority over the holder of a previously perfected security interest. As such, § 9–312(5) clearly grants priority in this controversy to BTCo. It follows that BTCo is thus entitled to summary judgment on the issue of whether its security interest has priority over that asserted by PCCA pursuant to § 9–309. As to the Trustee who, for purposes of the dispute between PCCA and BTCo only, has adopted the position of BTCo, it is axiomatic that, should the Trustee challenge BTCo's security interest and succeed under any of the avoidance provisions of the Bankruptcy Code, § 551 of the Bankruptcy Code preserves such an avoidance for the benefit of the estate. Therefore, summary judgment in favor of BTCo on this priority issue is essentially equivalent to summary judgment in favor of the Trustee and there remains no reason to further contest this issue against the Trustee.

■ The Court will next consider PCCA's contention that its alleged liens have priority over those of BTCo pursuant to UCC § 9–310. Section 9–310 provides for the priority of certain liens arising by operation of law. According to this section,

> When a person in the ordinary course of business furnishes services or materials with respect to goods subject to a securi-

ty interest, a lien upon goods in the possession of such person given by statute or rule of law for such materials or services takes priority over a perfected security interest unless the lien is statutory and the statute expressly provides otherwise.

By its terms, this statute is expressly applicable to goods in the claimant's possession. The only goods [18] in PCCA's possession with respect to which services were rendered were the bales of cotton. It is uncontroverted that PCCA had a statutory lien on those bales of cotton pursuant to § 7–209 for bale specific charges and that statutory lien had priority over BTCo's claim. In fact, those charges have been paid.

The Court has been provided with no evidence or authority that the cotton documents possessed by PCCA qualify as goods for purposes of § 9–310. Neither has the Court been presented with evidence or authority that a lien for services provided with respect to such documents arises by operation of law other than the argument advanced under UCC § 2–401, which argument has been rejected. Consequently, the Court must conclude that BTCo and the Trustee are entitled to summary judgment on the issue of whether PCCA holds a priority lien under § 9–310.

### COTTON DOCUMENTS:

### SETOFF

■ As discussed above, setoff in the bankruptcy context is governed by 11 U.S.C. § 553 which requires the existence of mutual prepetition debts between the debtor and the creditor exercising setoff. In order to be "mutual" for purposes of setoff, the debts "must subsist or be owing between the same parties, in the same right or capacity, and must be of the same kind or quality." *In re Braniff Airways*, 42 B.R. at 449.

As also discussed above, PCCA asserts that the debtor was indebted to it prepetition in the amount of $63,294.50 plus

18. *See,* UCC § 2–105.

$233.30 interest on that amount for service charges arising under the parties' alleged cotton merchandising agreement. According to PCCA, it retained possession of the cotton documents at issue to secure payment of these amounts and is thus entitled to setoff its claim against the proceeds of the cotton documents.

BTCo disputes the existence and validity of the merchandising agreement and, accordingly, the claim asserted pursuant thereto. Assuming arguendo, however, that the merchandising agreement is viable and the claims asserted thereunder valid, the issue becomes whether PCCA's possession of the cotton documents constituted a mutual debt to the prepetition debtor.

PCCA contends that under the alleged merchandising agreement, when the debtor purchased a DSO or cotton, the DSO documents and warehouse receipts were retained by PCCA and added to the computerized inventory management system. When the debtor arranged for the sale of cotton subject to the receipts or DSO's, PCCA performed the services necessary to prepare the cotton bales for shipment along with their respective warehouse receipts and prepared the information necessary for the debtor's invoice of its customer. For these services, PCCA charged the debtor $.50 per bale. According to PCCA, if these charges were not paid, "it was understood that PCCA had the right to refuse shipment ... [and] could collect the charges by selling the warehouse receipts, ..." (Affidavit of David Stanford, ¶¶ 14 and 15) From this understanding, PCCA asserts that, at a minimum, it has an equitable right to setoff.

As discussed above, the Court is without authority to extend the remedy of setoff beyond the parameters of those found in the Bankruptcy Code. Consequently, PCCA's prepetition obligation to the debtor "must be of the same kind and quality" as the debtor's prepetition obligation to PCCA in order for PCCA to be entitled to setoff its claim. *In re Braniff Airways, Inc.*, 42 B.R. at 449.

The evidence reflects that PCCA's asserted claim against the debtor is a monetary obligation for unpaid service charges. There is no evidence that PCCA had a *prepetition* monetary obligation to the debtor. Rather, PCCA's alleged obligation was to retain and manage the debtor's inventory and to perform the above described services. As such, it may not be concluded that PCCA's prepetition obligation to the debtor was in fact of the same kind or quality as the debtor's obligation to PCCA regardless of the parties' understanding. If PCCA had actually sold the warehouse receipts prepetition and owed the debtor the proceeds therefrom, this setoff argument might have merit; however, no evidence of *mutual, prepetition* obligations having been shown, the Trustee and institutional lenders are entitled to summary judgment on this issue with respect to the cotton documents.

## COTTON DOCUMENTS:

### RECOUPMENT

PCCA next contends that it is entitled to recoupment of its unpaid service charges from the proceeds of the warehouse receipts and DSO's. As discussed with regard to PCCA's similar argument concerning its storage charges for previously shipped cotton, recoupment is comparable to setoff in that it is essentially a counterclaim which requires mutual obligations between the parties. However, recoupment additionally requires that the parties' counterclaims arise from the same transaction. *See, In re Holford*, 896 F.2d at 178; *In re NWFX, Inc.*, 864 F.2d at 597. Accordingly, the initial flaw in PCCA's recoupment contention is that no mutual obligations between the debtor and PCCA, with respect to the cotton documents at issue, have been demonstrated. Therefore, even assuming that PCCA's asserted claim against these cotton documents is at least partially comprised of charges for services performed in connection with these same documents,[19] which might satisfy the same

---

**19.** Paragraph 17 of PCCA's Second Amended Complaint indicates that at least $12,048.50 of

its total claim is for service charges performed relative to previously transferred documents

transaction requirement, there has been no showing that PCCA was mutually indebted to the debtor. For this reason, the institutional lenders and the Trustee are entitled to summary judgment on this issue.

## COTTON DOCUMENTS:

### EQUITABLE COLOR OF LIEN

PCCA further asserts that it is entitled to recover its unpaid service contract charges from the cotton documents' proceeds because it held the cotton documents pursuant to an equitable color of lien. As discussed above, an equitable color of lien is a lien, enforceable in equity, which arises pursuant to the parties' express or implied agreement and custom and course of dealing with one another. It is a remedy imposed to avoid unjust enrichment. *See, e.g., Citizens Co-op Gin v. United States,* 427 F.2d 692 (5th Cir.1970); *In re McConnell,* 122 B.R. at 45. Thus, PCCA contends that it had an agreement with the debtor evidenced by the cotton merchandising agreement, its course of dealing with the debtor and custom in the industry, that if not paid for its service charges, it could sell the warehouse receipts in its possession, as well as those represented by the DSO's, and recover its charges from the proceeds. PCCA further contends that BTCo and the institutional lenders had notice of this agreement by virtue of the fact that they acquiesced in this arrangement.

PCCA supports this contention with the affidavit of David Stanford, Sales Manager for PCCA. This affidavit indicates that PCCA and the prepetition debtor in fact had such an agreement. However, no evidence has been provided which indicates that BTCo or the other institutional lenders were parties to such an agreement or were intricately involved in PCCA's dealings with the debtor through BTCo's sub-custodian, L & S Cotton Systems, or otherwise. To the contrary, Mr. Stanford's affidavit specifically states that the cotton documents were not held as custodian for

and shipped cotton while $51,246.00 is for services performed relative to the items possessed

BTCo, pursuant to agreement or otherwise, but rather by reason of the services PCCA was rendering to the debtor. (Affidavit of David Stanford, ¶ 11) As such, in light of the UCC provisions discussed above which set forth the requirements for liens enforceable against third parties, it may not be concluded that PCCA possesses an equitable lien, that has priority over the institutional lenders' security interest even though it may in fact have had an agreement, equitably and legally enforceable against the prepetition debtor. *See, e.g.,* UCC §§ 9–203; 9–113.

Moreover, it is well settled that under § 544 of the Bankruptcy Code, the bankruptcy trustee assumes the status of a judgment lien creditor as of commencement of the case. This position is superior to all claims against a debtor's estate except those that are properly perfected or otherwise entitled to priority. Given that PCCA's asserted equitable lien does not meet the statutory requisites of a secured claim, properly perfected prior to commencement of the case, it is not enforceable against the Trustee. Consequently, both the Trustee and the institutional lenders are entitled to summary judgment on this issue.

IT IS THEREFORE ORDERED that the motions for partial summary judgment filed by the institutional lenders and adopted by the Trustee are granted on the following issues:

(1) PCCA's warehouse receipts do not reflect properly reserved general liens on the possessory cotton in accordance with applicable law;

(2) PCCA's asserted seller's security interest and possessory lien do not have priority over the claims of BTCo and the Trustee;

(3) PCCA does not hold a purchase money security interest in the cotton and cotton documents;

(4) PCCA is not entitled to legal setoff of the amounts due;

at commencement of the case.

384

(5) PCCA is not entitled to equitable set-off of the amounts due;

(6) PCCA is not entitled to recoupment of the sums due; and

(7) PCCA is not entitled to recovery under an equitable color of lien theory.

There being no further issues remaining for trial, judgment will be entered in favor of the defendants.

SO ORDERED.